### In re GRAND JURY SUBPOENA DUCES TECUM (Richard Arrington Jr., Mayor).

### No. CV–91–Y–2922–S.

United States District Court, N.D. Alabama, S.D.

Jan. 2, 1992.

Joe R. Whatley, Jr., Samuel H. Heldman, Cooper Mitch Crawford Kuykendall & Whatley, Donald V. Watkins, David C. Johnson, Johnson & Cory, P.C., Birmingham, Ala., for Grand Jury Subpoena.

Frank W. Donaldson, Leon F. Kelly, Jr., Bill L. Barnett, U.S. Attorney's Office, Birmingham, Ala., for U.S.

## MEMORANDUM OF OPINION

EDWIN L. NELSON, District Judge.

I. Background.

The grand jury empaneled on November 13, 1990, issued and had served upon Richard Arrington Jr., Mayor of the City of Birmingham, Alabama, a subpoena duces tecum directing him to appear at 9:00 a.m. on Thursday, December 12, 1991, and there to produce to the said grand jury records which, essentially, amount to his calendar of events and schedules or agenda for the years 1986, 1987, 1988, 1989, 1990, and 1991. The subpoena was served upon Mayor Arrington on November 21, 1991, exactly three weeks before the date it was made returnable. At 8:25 a.m. on Thursday, December 12, 1991, thirty-five minutes before he was due to comply with the grand jury subpoena, Mayor Arrington and the City of Birmingham filed a motion to quash the subpoena and for other relief, including the disqualification of government counsel and the discharge of the grand jury. The motion consisted of eighty-six pages of typewritten material and was accompanied by four volumes of exhibits that, together, are almost seven inches thick. By written order filed at 10:51 a.m. on that date, the requested relief was denied in all respects because the petition was deemed to have been untimely. A motion for reconsideration was denied and Mayor Arrington and the city appealed to the Eleventh Circuit Court of Appeals. That appeal was dismissed on the afternoon of December 12, 1991, for want of appellate jurisdiction.

At 2:31 p.m. on that same date, the United States moved for an order to compel Mayor Arrington to appear before the grand jury and to produce the subpoenaed documents. The court conducted a hearing on the motion in chambers at approximately 3:00 p.m.[1] Counsel for Mayor Arrington, in response to the court's inquiry, affirmed that his client had already appeared before the grand jury and, on Fifth Amendment grounds, had refused to produce the subpoenaed documents. Though invited to state all grounds upon which he relied for the refusal, counsel articulated no other ground. Instead, counsel requested an additional week to file a brief dealing with the question of whether the subpoenaed papers were exempt from disclosure because they were Mayor Arrington's "personal papers" and that they would tend to incriminate him. With the agreement of counsel for the government, the witness was allowed until Friday, December 20,

---

1. The hearing was conducted in chambers at the request of Mayor Arrington's counsel and with the concurrence of government counsel. Fed. R.Crim.P. 6(e) protects from disclosure proceedings before the grand jury. The secrecy requirement is broader than it may appear from the face of the rule itself and encompasses anything that might reveal what transpired in the grand jury room, including the identities of witnesses, the strategy or direction of the investigation, or the deliberations or questions of the jurors.

1991, to file a brief and to support the claimed exemption by affidavit or otherwise. The United States was allowed until Monday, December 30, 1991, to respond in like fashion.

Mayor Arrington's brief in opposition to the motion to compel was filed, as scheduled, on December 20, 1991. Only twenty-four pages of the brief are devoted to any issue concerning the subpoena itself. The remaining seventy pages are dedicated to an effort to convince the court that it should intervene to short-circuit the present grand jury investigation based upon the asserted misconduct of government counsel. The government's responsive brief was received on Monday, December 30, 1991, and Mayor Arrington filed a reply on Tuesday, December 31, 1991.

II. Claimed Misconduct of Government Counsel.

■ Mayor Arrington asserts that the grand jury investigation is motivated by personal animosity on the part of individuals in the United States Attorneys Office and "is a racially and politically motivated effort to railroad me and to damage black politics and Democratic Party politics." (Affidavit of Richard Arrington, Jr., ¶ 12 (filed Dec. 20, 1991)). He seeks, *inter alia,* an order disqualifying all attorneys in that office, discharging the present grand jury from further responsibility with regard to any investigation of his activities, and enforcing a promise made by representatives of the United States Department of Justice that there would be no retaliation for his having filed complaints with that department's Office of Professional Responsibility.

■ Our constitution charges to the executive branch of government the responsibility for investigation and prosecution of crime. Judicial deference to the prosecutorial function and its attendant discretion in deciding who, when, where, and how to prosecute is founded upon the constitutional separation of powers. *Smith v. Meese,* 821 F.2d 1484, 1491 (11th Cir.1987). The courts generally indulge a rebuttable presumption that criminal prosecutions are

undertaken in good faith. *Johnson v. Wainwright,* 778 F.2d 623, 631 (11th Cir. 1985), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987) (exercise of prosecutorial discretion entitled to deference because of public belief that discretion is exercised with expertise and in the interest of justice); *United States v. Hoover,* 727 F.2d 387, 389 (5th Cir.1984) (presumption that a criminal prosecution is undertaken in good faith). The decision whether to investigate or to prosecute is one that is particularly ill suited to the judicial process.

Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motive and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530–31, 84 L.Ed.2d 547, 556 (1985). To recognize the inherent difficulties associated with judicial oversight of the prosecutorial function is not to say, however, that no such oversight is ever appropriate. The decision to prosecute may not, for example, be based upon impermissible factors such as race, color, religion, or national origin. *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

In appropriate circumstances, the court must intervene to protect rights afforded persons under the Constitution and laws of the United States. "[I]n the rare situation in which the decision to prosecute is so abusive of this discretion as to encroach on constitutionally protected rights, the judiciary must protect against unconstitutional deprivations." *United States v. Johnson,* 577 F.2d 1304, 1307 (5th Cir.1978). This

case does not present one of those "rare situations" that requires judicial intervention at this time and at this place. The unique relationship between the judiciary and executive branches of government and the federal grand jury compels the conclusion that this matter is premature. The place of the grand jury has been aptly described:

The federal court and the federal prosecutor complement each other in their relationship to the federal grand jury. The prosecutor initiates the grand jury procedure, draws up the indictment, decides which witnesses to call and examines those witnesses who do appear. These functions are in essence "executive" and not subject to judicial review. It is the court, however, which must compel recalcitrant witnesses to appear before the grand jury. And, because the court adjudicates the criminal case that results from the indictment, it is the court which, at least as a practical matter, has the power to dismiss an indictment for failure to charge all elements of the offense or for prosecutorial abuse of the grand jury process. These latter functions have prompted a number of circuits to hold that the federal judiciary exercises a supervisory power over the federal grand jury, a power which by definition is not coextensive with the court's power to correct grand jury abuses that violate the Constitution. While we recognize such a power,

given the constitutionally-based independence of each of the three actors—court, prosecutor and grand jury—we believe a court may not exercise its "supervisory power" in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so. If the district courts were not required to meet such a standard, their "supervisory power" could readily prove subversive of the doctrine of separation of powers.

*United States v. Pabian,* 704 F.2d 1533, 1536–37 (11th Cir.1983) (quoting *United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977) (citations omitted)); *see also Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (federal court does not have power to dismiss an indictment for prosecutorial misconduct unless such misconduct is prejudicial to the defendant).[2]

 Here, unlike the plaintiffs in *Smith v. Meese, supra,* Mayor Arrington asks this court to assume the essentially executive function of "deciding whether a particular alleged violator should be prosecuted." *Meese,* 821 F.2d at 1490 n. 2 (quoting *Nader v. Saxbe,* 497 F.2d 676, 679 (D.C.Cir. 1974)). The decision whether to investigate and prosecute a particular individual is generally a matter consigned by the Constitution to the discretion of the executive branch, *Meese,* 821 F.2d at 1492, and one who would challenge that discretion must carry a particularly heavy burden to demonstrate that constitutional rights have been violated. *McCleskey v. Kemp,* 481 U.S. 279, 292–97, 107 S.Ct. 1756, 1767–70, 95 L.Ed.2d 262, 278–82 (1987) (complex statistical study insufficient to establish relationship between race and imposition of death penalty); *United States v. Schoolcraft,* 879 F.2d 64, 68 (3rd Cir.), *cert. denied,* 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989) (claim of selective prosecution must be supported by evidence); *United States v. Buffington,* 815 F.2d 1292, 1305 (9th Cir.1987) (must produce evidence establishing elements of selective prosecution); *United States v. Greenwood,* 796 F.2d 49, 52 (4th Cir.1986) (speculation concerning racial bias not sufficient); *United States v. Hintzman,* 806 F.2d 840, 842 (8th Cir.1986) (defendant must produce evidence of impermissible intent or discrimination); *United States v. Irish People, Inc.,* 796 F.2d 520, 526 (D.C.Cir.1986) (story in small ethnic newspaper not sufficient);

**2.** The Supreme Court concluded in *Bank of Nova Scotia v. United States* that "[t]he prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict. If violations did substantially influ-

ence this decision, or if there is grave doubt that the decision to indict was free from such substantial influence, the violations cannot be deemed harmless." *Bank of Nova Scotia,* 487 U.S. at 263, 108 S.Ct. at 2378.

*United States v. Sun Myung Moon,* 718 F.2d 1210, 1229–30 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984) (mere suspicion concerning government motives not sufficient to show selective prosecution); *United States v. McCord,* 695 F.2d 823, 826 (5th Cir.) (per curiam), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1533, 75 L.Ed.2d 953 (1983) (fact that statute not used for many years is not sufficient to establish selective prosecution).

■ It is important to note here that the grand jury is merely conducting an investigation. Mayor Arrington may or may not be subject to indictment by the grand jury. "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *United States v. Calandra,* 414 U.S. 338, 343–44, 94 S.Ct. 613, 617–18, 38 L.Ed.2d 561, 569 (1974). Certainly, on the face of the matters presented here, it appears that there might be probable cause based upon the testimony of Tarlee Brown to support an indictment.[3] Mr. Arrington asserts vigorously that Mr. Brown, with the aid of government lawyers and investigators, perjured himself. But the credibility of Mr. Brown, at this stage, is a matter for consideration by the grand jury, and not by this court. No one is immune from investigation and, if the evidence warrants, indictment by the grand jury. The motion to disqualify government counsel, discharge the grand jury, and to enforce an alleged promise of no retaliation will be denied.

III. The Grand Jury Subpoena Duces Tecum.

A. *The Fifth Amendment Objection.*

■ Mayor Arrington seeks to avoid production of documents reflecting his activities for the years stated in the subpoena on the basis of the Fifth Amendment privilege against compelled self-incrimination. The

essence of this claim, as taken from his affidavit, is:

I have a deep and abiding concern that the documents which have been subpoenaed will be used to create perjured testimony against me.... For reasons explained in more detail in the petition that I have filed and that I am refiling with the Court, the U.S. Attorney and his assistants are biased against me. They have already met with [Tarlee] Brown and concocted one false story, when the U.S. Attorney promised in writing not to prosecute Brown for innumerable federal crimes. I am concerned that [the prosecutors] will repeat this conduct. If they obtain my schedules, then they will obviously be in a position to meet with Brown, and others whom they may force or coerce, to fabricate another story, while using my own personal schedules (and even my own personal notes) to match the story with my schedule.

(Arrington Affidavit ¶ 12).

■ Textually, the protection afforded under the Fifth Amendment is limited to the right not to "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, it is only when one is "compelled" to give *incriminating* evidence that the privilege provided by the Fifth Amendment is applicable.

While the application of the Fifth Amendment privilege to various types of claims has changed in some respects over the past three decades, the basic test reaffirmed in each case has been the same.

"The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination. *Rogers v. United States,* 340 U.S. 367, 374 [71 S.Ct. 438, 442, 95 L.Ed. 344] (1951); *Brown v. Walker,* 161 U.S. 591, 600 [16 S.Ct. 644, 648, 40 L.Ed. 819] (1896)." *Marchetti v. United*

---

3. Indeed, Mr. Brown has plead guilty to criminal charges in this court in connection with charges arising out of bribes he allegedly paid to Mayor Arrington.

**1524**

States, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968).

United States v. Apfelbaum, 445 U.S. 115, 128, 100 S.Ct. 948, 956, 63 L.Ed.2d 250, 262 (1980). To avail himself of the protection of the Fifth Amendment, the witness "must be faced with substantial and real hazards of self-incrimination." United States v. Reis, 765 F.2d 1094, 1096 (11th Cir.1985). The requirement that a statement be "incriminating" is a separate and distinct condition for invocation of the Fifth Amendment privilege. Doe v. United States, 487 U.S. 201, 207–08, 108 S.Ct. 2341, 2346, 101 L.Ed.2d 184 (1988).

 Mayor Arrington claims that he is exempt from the compelled production of his "personal papers" but he does not claim that the production of those papers would incriminate him. Rather, the clear import of his affidavit is that, properly used for their true content, the documents would exonerate him and that it is their misuse by prosecutors that he fears. (Arrington Affidavit ¶ 12). Grand jury witnesses may not avoid production of documents based upon the Fifth Amendment "for a sentimental reason, or for purely fanciful protection of the witness against an imaginary danger." Apfelbaum, 445 U.S. at 126, 100 S.Ct. at 954. Where there is no claim that the subpoenaed papers would be incriminating, the witness has not shown a "substantial and real hazard of self-incrimination." See Grosso v. United States, 390 U.S. 62, 65, 88 S.Ct. 709, 712, 19 L.Ed.2d 906 (1968). In any event, the Fifth Amendment provides no protection for any privacy interests in the contents of voluntarily prepared personal papers. United States v. Doe, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (no right of privacy in papers of sole proprietorship under the Fifth Amendment); Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

Mayor Arrington argues that the court is bound by the Fifth Circuit's decision in United States v. Davis, 636 F.2d 1028 (5th Cir.), cert. denied, 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981). In Davis the Fifth Circuit held that the Supreme Court's

decision in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), mandated the conclusion that

> incriminating papers in the actual or constructive possession of an individual, which he holds in his individual capacity, rather than in his representative capacity, and which he himself wrote or which were under his immediate supervision, are absolutely protected ... from production by subpoena or equivalent process, regardless of whether they are business-related or more inherently personal in content.

Davis, 636 F.2d at 1043. The Supreme Court, however, in Fisher v. United States, supra, rejected in large part the rationale underlying its earlier decision in Boyd. Fisher, 425 U.S. at 407, 96 S.Ct. at 1579 ("Several of Boyd's express or implicit declarations have not stood the test of time."). Despite whatever remaining vitality Boyd might have, this action is controlled by the Supreme Court's recent decision in United States v. Doe, supra, wherein it held that the privilege granted by the Fifth Amendment against compelled self-incrimination is directed at the act of producing documents, 465 U.S. at 617, 104 S.Ct. at 1244, rather than the contents of those documents. See also id. at 618, 104 S.Ct. at 1245 (O'Connor, J., concurring) ("the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind.").

Mayor Arrington next argues in his brief, but does not support the claim in his affidavit, that the very act of producing the subpoenaed papers would require him to provide testimony by admitting their existence, his possession of them, and their authenticity. United States v. Argomaniz, 925 F.2d 1349, 1356 (11th Cir.1991). In Fisher v. United States, supra, the Supreme Court looked to the question of whether the production of the documents requested there from a taxpayer's attorney would have infringed upon Fifth Amendment rights if demanded from the taxpayer himself and found that the act of production would have "only minimal testimonial value and would not operate to incriminate the taxpayer." Doe, 465 U.S. at 613, 104

S.Ct. at 1242. Questions concerning whether compelled production has testimonial value and is incriminating do not fit neatly into fixed categories. Their answers may "instead depend on the facts and circumstances of particular cases or classes thereof." *Fisher*, 425 U.S. at 410, 96 S.Ct. at 1581.

The court is confident that the compelled production of Mayor Arrington's calendar would not involve testimonial self-incrimination. First, as noted, he does not claim that the contents of those documents would incriminate him but instead implies strongly that they would have the opposite effect. The subpoenaed documents were prepared voluntarily, in large part by persons other than Mayor Arrington and "cannot be said to contain compelled testimonial evidence, either of [Mayor Arrington] or of anyone else." *Fisher*, 425 U.S. at 409–10, 96 S.Ct. at 1580. Mayor Arrington has described the documents in some detail including the manner in which they are customarily created and maintained. "Surely the Government is in no way relying on the 'truthtelling' of [Mayor Arrington] to prove the existence of or his access to the documents." *Id.* at 411, 96 S.Ct. at 1581. "The existence and location of the papers are a foregone conclusion and [Mayor Arrington] adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers. Under these circumstances by enforcement of the [subpoena] 'no constitutional rights are touched. The question is not of testimony but of surrender.'" *Id.* (quoting *In re Harris*, 221 U.S. 274, 279, 31 S.Ct. 557, 558, 55 L.Ed. 732 (1911)). Where the existence and possession or control of the subpoenaed documents is not in issue, the witness gives up nothing by responding to the subpoena. *Id.* at 411–12, 96 S.Ct. at 1581. If it is assumed that production of the documents has some minimal testimonial value, it is not illegal for the mayor of the city to maintain a calendar reflecting his daily schedule. Neither "the fact of existence of the papers or of their possession by [Mayor Arrington] poses any realistic threat of incrimination to [him]." *Id.* at 412, 96 S.Ct. at 1581. As for the claim that production

by Mayor Arrington would "authenticate" the subpoenaed documents, it is sufficient to note, as did the *Fisher* court, that such production would do nothing more than express his belief "that the papers are those described in the subpoena." *Id.* at 413, 96 S.Ct. at 1582.

### B. *The Fourth Amendment Objection.*

 Mayor Arrington also seeks to avoid production of the subpoenaed documents on Fourth Amendment grounds. It is well established that a grand jury has broad powers to investigate possible violations of criminal laws. The Supreme Court has recognized that a "grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *Calandra*, 414 U.S. at 343, 94 S.Ct. at 617. Further, federal courts have the power to compel persons to appear and testify before a grand jury. *Id.* at 345, 94 S.Ct. at 618. The grand jury, however, may not violate a valid privilege established by the constitution, statutes, or common law in the exercise of its subpoena power. "A grand jury's subpoena duces tecum will be disallowed if it is 'far too sweeping in its terms to be regarded as reasonable' under the Fourth Amendment." *Id.* at 346, 94 S.Ct. at 619 (citing *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906)); *see also United States v. Dionisio*, 410 U.S. 1, 11, 93 S.Ct. 764, 770, 35 L.Ed.2d 67, 78 (1973) ("The Fourth Amendment provides protection against a grand jury subpoena duces tecum too sweeping in its terms 'to be regarded as reasonable.' "). The grand jury subpoena "is not unreasonable under the Fourth Amendment if it: (1) commands the production only of things relevant to the investigation; (2) specifies the items with reasonable particularity; and (3) covers only a reasonable period of time." *In re Grand Jury Subpoenas*, 906 F.2d 1485, 1496 (10th Cir.1990).

Under these standards, the subpoena at issue here is clearly reasonable. Tarlee

Brown has stated that he met with Mayor Arrington on three or more occasions when he paid money to the Mayor in return for some consideration done in the Mayor's official capacity. The Mayor's calendars are relevant to sustain, or question, the credibility of Mr. Brown. The documents demanded are described with particularity, and, finally, the period of time specified is consistent with the period of the alleged wrongdoing.

Mayor Arrington cannot escape production of the subpoenaed documents on Fourth Amendment grounds.

### C. *The First Amendment Objection.*

 Mayor Arrington asserts that the subpoena should not be enforced against him because it "seeks to compel disclosure of the names of all persons with whom [he] has met during the last several years," (Arrington Response Brief at 20), and also seeks information concerning the contents of his meetings with those persons. *See NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Where both speech and non-speech components are present in a course of conduct, a sufficiently important governmental interest provides justification for "incidental limitations on First Amendment freedoms." *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). Government regulation is justified

> if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Wayte v. United States,* 470 U.S. at 611, 105 S.Ct. at 1532–33 (quoting *United States v. O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679).

It cannot be seriously contested that the grand jury is constitutionally empowered to subpoena appointment schedules and records required in conjunction with matters then under investigation by the grand jury. *Calandra,* 414 U.S. at 343, 94 S.Ct. at 617. Allegations have been made that Mayor Arrington has accepted payments of money in return for acts done by him in his official capacity in violation of federal law and that such payments were made in his office at city hall in the City of Birmingham, Alabama. Records of his appointments are relevant to the grand jury's investigation of those allegations. The government has a compelling interest in investigating possible violations of its laws. *In re Grand Jury Proceeding,* 842 F.2d 1229, 1236 (11th Cir.1988). The demand for the records is not related to the suppression of free speech or any right of association. The proceedings before the grand jury are secret and the documents and their contents can be used only in accord with applicable law. As noted, Mr. Brown has testified that he paid bribes to Mayor Arrington in the mayor's office. The implication is that payments continued over a substantial period of time. Mayor Arrington vigorously asserts that Mr. Brown has lied and publicly and in these proceedings has asserted that the subpoenaed documents will prove the falsity of Mr. Brown's charges. *See, e.g.,* Arrington Affidavit ¶ 12. The grand jury's function is to determine whether crime has occurred. To suggest that it seeks records that Mayor Arrington says will exonerate him for the purposes of infringing his First Amendment rights of speech and association is not reasonable in these circumstances. Finally, since the investigation covers a period of years consistent with the time for which the records are sought, the subpoena places no greater burden on First Amendment rights than is necessary to the conduct of the investigation.

### IV. Conclusion.

For the reasons stated herein, the government's motion to compel Mayor Arrington to comply with the grand jury subpoena duces tecum by producing the documents described in that subpoena will be granted. Mayor Arrington will be ordered to appear before the next session of the grand jury convened on November 13,

1990, and, then and there, to produce to the grand jury the subpoenaed documents.

The motion of Mayor Arrington and the City of Birmingham to quash the grand jury subpoena duces tecum, for the disqualification of all attorneys in the Office of the United States Attorney for the Northern District of Alabama, and to discharge the grand jury convened on November 13, 1990, will be denied. Costs will be taxed against the City of Birmingham and Mayor Richard Arrington.